IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

WORTMAN V. CARRENDER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DALTON M. WORTMAN, APPELLEE,

V.

JESSICA L. CARRENDER, APPELLANT.

Filed January 15, 2019.    No. A-17-1317.

Appeal from the District Court for Cuming County: MARK A. JOHNSON, Judge. Affirmed in part, and in part reversed.

Avis R. Andrews for appellant.

Amy K. Miller, of Miller Law, for appellee.

MOORE, Chief Judge, and PIRTLE and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Jessica L. Carrender appeals from an order of the district court for Cuming County, which order determined paternity, custody, parenting time, and child support for Jessica and Dalton M. Wortman's son, Owen. On appeal, Jessica challenges the district court's decision to award Dalton sole physical and legal custody of Owen. In addition, she asserts that the court erred in changing Owen's surname from Carrender to Wortman. For the reasons set forth herein, we affirm the district court's decision as to custody, but reverse the court's decision to change Owen's surname.

## BACKGROUND

Jessica and Dalton have one child together, Owen, born in June 2016. Jessica and Dalton never had a sustained relationship with each other. They exchanged messages through social media and texts, until one day they agreed to meet in person. During this in-person meeting, Dalton

picked Jessica up from a gas station. They then had sexual intercourse in Dalton's car. After, Dalton dropped Jessica off at the same gas station. Apparently, neither Jessica nor Dalton intended to see each other again after this encounter. However, a few weeks later, Jessica contacted Dalton and told him she was pregnant. Jessica also told Dalton that another man was the father of the baby. In September 2016, a few months after Owen's birth, paternity testing revealed that the other man was not Owen's father. As a result, Dalton submitted to a paternity test. In January 2017, Dalton learned that he was Owen's father.

When Dalton learned he was Owen's father, Jessica told him that if he wanted to see Owen, Dalton should contact her mother, Angela Toelle, because Owen was staying with Angela while Jessica was living in a different city. Dalton immediately contacted Angela and set up a visit with Owen. The visit was held at Angela's home and went well. Jessica was not present during this visit. After the first visit, Dalton began having parenting time with Owen every couple of days at Dalton's home. Soon thereafter, he began having parenting time with Owen for entire weekends. During this time, Dalton communicated only with Angela, not with Jessica. There is some indication in the record that Jessica was not informed that these visits were taking place.

On January 20, 2017, Dalton filed a complaint in the district court for the determination of paternity, custody, and child support for Owen. He requested custody of Owen subject to Jessica's parenting time. In addition, he requested that Owen's name be changed from Jessica's last name, Carrender, to Dalton's last name, Wortman. In Jessica's answer, she also requested sole custody of Owen. She resisted Dalton's request to change Owen's surname.

On February 2, 2017, the district court entered a temporary order granting Jessica and Dalton joint legal and physical custody of Owen pending trial. Each was to have physical custody of Owen in alternating weeks. Dalton was ordered to pay $114 per month in child support.

Trial was held on November 6, 2017. At trial, both Jessica and Dalton testified. In addition, the parties called Jessica's mother, stepfather, and uncle; Dalton's fiance and mother; and multiple family friends.

Jessica testified that at the time of trial, she was 19 years old. She was 18 years old at the time of Owen's birth and had just graduated high school the month before he was born. For the few months preceding the trial, Jessica lived in Angela's four bedroom home, which is located approximately 18 miles from Dalton's home. Owen has his own bedroom in the home and Jessica indicated that she planned to live with Angela until she could afford a home of her own. Prior to moving back in with Angela, Jessica briefly had her own apartment. However, during the weeks that she had custody of Owen, both Jessica and Owen would stay with Angela. Jessica denied that she had ever moved away from Owen after his birth. She explained that she had briefly "stayed with a friend" in South Sioux City, Nebraska, after Owen's birth. Jessica also acknowledged that a post from one of her social media accounts and text messages exchanged with Dalton indicated that she, in fact, had moved to South Sioux City in December 2016.

Since July 2017, Jessica has attended beauty college in Fremont, Nebraska. She has class every Tuesday through Saturday, from 8 a.m. until at least 5 p.m. During Jessica's weeks with Owen, Angela typically watches Owen while Jessica attends her classes. Jessica is also employed part-time as a receptionist at a hair salon. She only works at this job during the weeks Owen is

with Dalton. In addition, Jessica occasionally cleans houses or businesses for her family members and friends. Jessica's career goal is to open her own hair salon.

Jessica testified that she has a bond with Owen. She indicated that she has matured a great deal since Owen's birth. She has taken steps to get a job and go to school. Jessica testified that she is able to care for Owen independently. Prior to Owen's birth, Jessica sought out assistance from Northeast Nebraska Community Action. She has received parenting advice and assistance from this agency and at the time of trial continued to receive services one time per month. In addition, Jessica receives services from a federal supplemental program for women and children. During her testimony, Jessica explained that while Angela has "been the primary caregiver [of Owen] with money, [Jessica has] been watching him most of the time." Jessica testified that she has a good support system, including, Angela, her stepfather, her grandmother, and her uncle. Jessica indicated that each of these family members interacts with Owen regularly and each supports her in her role as Owen's mother.

Jessica testified that she believes that the joint custody arrangement established in the temporary order has been working and that she would like the arrangement to continue. She testified that she believes that Owen should spend a significant amount of time with her because she communicates well with Dalton and because she has been through a lot with Owen. Jessica explained that there were complications at Owen's birth which made him unable to breathe normally. Jessica described the emotional impact this situation had on her. Jessica also testified that she believes that Dalton is a good parent and that Owen's relationship with Dalton is important. Jessica indicated that she does have concerns about Dalton taking Owen to demolition derbies because she does not believe such activity to be appropriate for a small child. There was also testimony which indicated that Jessica does not get along well with Dalton's fiance, Andrea Gibson. However, Jessica testified that she was willing to try to get along with Andrea for Owen's sake. Jessica testified that she wanted Owen to keep her last name because he has had that name since birth.

Jessica admitted that she suffered from postpartum depression for a few months after Owen's birth. In addition, she indicated that she has been taking medication for depression since she was 13 years old. As recently as June 2017, Jessica sought medical help as a result of suicidal ideations. Jessica provided evidence from her doctor that by the time of the trial, she was doing well on her medication and was participating in counseling. Jessica also suffers from epilepsy and has a history of seizures. She takes medication to control the seizures; however, at some point after Owen's birth, Jessica reported that she and Owen needed to live with Angela as a result of Jessica's epilepsy. During her testimony, Jessica indicated that she is currently "both mentally and physically healthy" and able to care for Owen. Jessica also admitted that she has used marijuana as recently as January 2017. In addition, at the time of trial, she had an active restraining order against her. The order was issued in September 2017 and was taken out against Jessica by a former high school classmate.

Dalton is currently 24 years old. He testified that he currently lives in a two-bedroom house with his fiance, Andrea, who is 28 years old. Dalton and Andrea purchased the home together. Owen has his own bedroom in the house and he enjoys playing in the home's "decent-sized yard." Dalton has lived in this home for over a year. In fact, he has only lived at one other location since

the time that Owen was born in June 2016. Dalton began dating Andrea in August 2016. They moved in together in approximately November 2016. They are now engaged to be married.

Dalton is currently employed as a mechanic. He works 45 hours per week. Dalton had been at his current position for only 4 months prior to the trial. Before taking his current job, he was employed as a mechanic at two other locations. He left both of these jobs because he wanted to be able to do welding work, which he is able to do at his current place of employment. During the weeks that Dalton has custody of Owen, Owen attends an in-home daycare located approximately 35 minutes from Dalton's home while he and Andrea are at work. Although the daycare is not licensed, it was referred to Dalton by a family friend and Owen knows other children who attend the daycare. Dalton testified that he was happy with the daycare. Andrea typically takes Owen to daycare before going to work and picks him up after work.

Dalton testified that he believes that he should have primary physical custody of Owen. He indicated that he can provide Owen with a "family structure [and a] routine." In addition, Dalton testified that in his custody, Owen would "have a happy environment, always positive." Dalton indicated that Andrea assists him with caring for Owen. Andrea watches Owen when Dalton is not available to do so. She also attends Owen's doctor's appointments with Dalton. Dalton described Andrea as being very supportive of his relationship with Owen. In addition to Andrea, Dalton indicated that his parents live nearby and help care for Owen. He also has supportive grandparents and friends. Dalton testified that he believed that joint physical custody would no longer be feasible once Owen started attending school because he and Jessica do not live in the same community.

Dalton expressed concerns about Jessica's parenting, asserting that she was not a fit and proper person to have custody of Owen. He testified that it is Angela who cares for Owen during Jessica's weeks with him, not Jessica. Dalton also explained that when the parties meet to exchange Owen, it is always Angela who tells Dalton about Owen's previous week. Dalton indicated that Jessica routinely and repeatedly calls and texts him during his parenting time, sometimes five or six times per day, even though he has always notified her when something "significant" occurs with Owen. In addition, Dalton detailed the problems that had occurred during the parties' exchanges of Owen. Dalton explained that Jessica often brings multiple family members with her to the exchanges. They all then engage in "long, dramatic good-byes" with Owen, which upsets Owen and makes the transition difficult. In contrast, Dalton says his good-byes to Owen before meeting up with Jessica. He wants Owen to feel excited about seeing Jessica. Jessica has gotten into confrontations with Andrea during the exchanges, calling her names and on one occasion threatening to "knock [her] out." Dalton admitted that at the last few exchanges, only Dalton, Jessica, and Owen have been present. These transitions have worked "pretty good."

As we noted above, both parties called other witnesses to testify about their parenting skills and relationship with Owen. Angela, Jessica's mother, testified that she believes Jessica to be capable of independently parenting Owen. Specifically, Angela testified that Jessica has become more mature in the months immediately preceding the trial. She has learned to put Owen's needs first and has been able to make good decisions for Owen. She indicated that Jessica was not capable of this immediately after Owen's birth. Jessica suffered from postpartum depression and was sad, experienced dizzy spells, and became anemic and weak. Angela testified that she has observed a bond between Jessica and Owen. Angela also testified that she has no concerns about Dalton's

parenting abilities. She indicated that both Jessica and Dalton love Owen and it is best for both to be involved in Owen's life. Jessica's other witnesses agreed with Angela that Jessica's parenting skills have dramatically improved since Owen's birth and that she is now a capable and involved parent.

Dalton called Andrea to testify. Andrea testified that she has a bachelor's degree in child development and family studies. She is employed as the director of a child development center, which was being built at the time of trial. She is also a certified carseat technician. Andrea testified that Dalton and Owen are very close and Owen loves Dalton very much. She indicated that Dalton bathes Owen, feeds Owen, reads to Owen, and plays with Owen. In addition, Andrea treats Owen as if he were her own child. Andrea indicated that she does not believe that Jessica should have custody of Owen because Jessica is "mentally unstable" and because Angela is the one who cares for Owen when he is in Jessica's custody. Dalton's mother generally testified that Dalton is a good parent and that Owen is bonded to Dalton.

After the trial, the district court entered an order dated November 29, 2017, awarding Dalton legal and physical custody of Owen subject to Jessica's parenting time. Jessica was awarded parenting time every other weekend from Thursday at 7 p.m. until 9 a.m. the next Monday. In addition, she was awarded 6 weeks of continuous parenting time during the summer months. Jessica was ordered to pay $50 per month in child support.

In the lengthy, detailed order, the district court analyzed a number of factors in reaching its decision as to custody and parenting time. The court specifically found that although both parents are fit, Dalton could provide Owen with a more stable environment than Jessica could. The court also noted its "concerns over [Jessica] being solely responsible for the care of Owen, without her mother's presence, due to [Jessica]'s medical and mental health issues." In addition, the court found that joint physical custody is not in Owen's best interests as Dalton and Jessica reside in different communities "and very soon Owen will begin attending preschool."

The district court also granted Dalton's request to change Owen's surname from Carrender to Wortman. The court stated:

[I]t is the Court's opinion since physical custody is being placed with [Dalton] and Owen will soon begin preschool, that it is in Owen's best interest to have the surname of "Wortman" to avoid difficulties or embarrassment in school the child may experience due to bearing a different last name from Wortman.

Jessica appeals from the district court's order.

## ASSIGNMENTS OF ERROR

Jessica assigns two errors in her brief on appeal. First, she asserts that the district court abused its discretion in awarding Dalton sole custody of Owen. Second, she asserts that the district court erred in changing Owen's surname from Carrender to Wortman.

## STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial court,

whose judgment will be upheld in the absence of an abuse of discretion. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

An appellate court reviews a trial court's decision concerning a requested change in the surname of a minor de novo on the record and reaches a conclusion independent of the findings of the trial court. *In re Change of Name of Slingsby*, 276 Neb. 114, 752 N.W.2d 564 (2008). Provided, however, that where credible evidence is in conflict on a material issue of fact, the appellate court considers and gives weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

ANALYSIS

CUSTODY

Jessica argues that the district court erred in awarding Dalton sole custody of Owen. She argues that the court should have awarded joint physical and legal custody because such an arrangement had been working for the approximately 9 months the proceedings were pending. Jessica asserts that the evidence presented at the trial revealed that both she and Dalton were capable of providing Owen with stability and security. Upon our de novo review of the record, we cannot say that the district court abused its discretion in awarding Dalton sole custody of Owen. As such, we affirm the decision of the district court.

The standard for determining custody is parental fitness and the child's best interests. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). Nebraska's Parenting Act states that it is in the best interests of the child to have a "safe, stable, and nurturing environment." See Neb. Rev. Stat. § 43-2921 (Reissue 2016). To determine the best interests of a child, a court must consider, at a minimum: (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). Other pertinent factors a court may consider in determining the best interests of a child include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

The district court found that both Jessica and Dalton are fit parents. However, the court also found that continuing the joint physical custody arrangement established in the temporary order was not feasible long-term. The district court specifically noted that Jessica and Dalton do not reside in the same community and that the distance between their homes would make joint physical custody difficult once Owen started attending preschool. Given the evidence presented at trial, we cannot say that the district court abused its discretion in finding that joint physical custody

was not in Owen's best interests. The parties do live some distance from each other. Additionally, evidence presented at the trial indicated that, even at an early age, Owen often struggled during the transition from one parent to the other. Moreover, the evidence indicated that there is some degree of animosity between Jessica and Dalton and that they struggle to work together to parent Owen. Such struggles, coupled with the difficulties of a joint custody arrangement as Owen grows closer to attending a more regular school environment, support the district court's decision not to award the parties joint physical custody.

Ultimately, the district court awarded Dalton sole physical custody of Owen because the court believed Dalton could provide Owen with a more stable home life. The court noted that Dalton is employed on a full-time basis, is engaged to be married, and has his own residence. As soon as Dalton discovered he was Owen's father, he took steps to become involved in Owen's life. In addition, the court noted that no one who testified at trial indicated any significant concerns regarding Dalton's parenting abilities. To the contrary, the court indicated it had concerns about Jessica's ability to independently parent Owen given her "medical and mental health issues." The court also mentioned concerns regarding Jessica's "unstable lifestyle" and her "lack of consistent attendance of Owen." The court credited Jessica for working toward improving her parenting skills, but decided that it would not be in Owen's best interests for Jessica to have sole physical custody.

We cannot say that the district court's decision to award Dalton sole physical custody was an abuse of discretion. The evidence presented at trial revealed that everyone involved in Owen's life, and especially Jessica and Dalton, loves Owen very much. However, it is clear that Dalton can provide Owen with more stability and security than Jessica currently can. Jessica still lives with Angela and is currently attending school. She appears to regularly rely on the help provided by Angela and her stepfather to care for Owen. In fact, both Dalton and Andrea were of the opinion that Angela is Owen's primary caregiver during the weeks that Jessica had custody. Although Jessica and her supporting witnesses all testified that Jessica has matured since giving birth to Owen, it is clear that she still struggles to make mature decisions. This is evidenced by her difficulties in communicating with Dalton and Andrea appropriately and her struggles to put Owen's needs ahead of her own frustrations. Based on this evidence, and evidence regarding Dalton's communication style with Jessica, it appears that Dalton is more capable of facilitating Owen's relationship with Jessica than Jessica would be at facilitating Owen's relationship with Dalton. Dalton expressed an understanding of the importance of Owen's relationship with Jessica and with Jessica's family.

In addition, as discussed by the district court, there is some concern regarding Jessica's mental and physical health. While Jessica testified that at the time of the trial she was physically and mentally healthy, this has not been the case for an extended period of time. As recently as June 2017, Jessica experienced suicidal ideations. In addition, it appears that up until very recently, Jessica believed she should stay at Angela's home with Owen due to concerns about her seizures.

Given the evidence presented at the trial, we do not find that the district court abused its discretion in awarding Dalton sole physical custody of Owen. We affirm the decision of the district court.

We note that in her brief on appeal, Jessica also asserts that the district court erred in awarding Dalton sole legal custody of Owen rather than awarding the parties with joint legal custody. However, the focus of Jessica's argument on appeal and both of the parties' focus at trial was physical custody. Both parties testified very briefly at trial that they would be fine with continuing the joint legal custody arrangement established by the temporary order. However, both parties testified in detail about their contentious relationship with each other and the problems they have encountered with the joint custody arrangement. Additionally, we note that in his complaint, Dalton appears to have requested that he be awarded both joint physical and joint legal custody of Owen when he asked the court to award him the "care, custody, and control" of Owen.

The district court awarded Dalton sole legal custody of Owen. Upon our de novo review of the record, we find that the evidence presented at trial supports the district court's decision. The parties do not get along well with each other. During the pendency of the proceedings, they struggled to appropriately communicate with each other regarding such things as doctor's appointments and childcare. In addition, as we discussed above, the parties do not live in the same community, a factor which may increase tensions when they are faced with making decisions about Owen's education, medical care, and activities. We affirm the decision of the district court which awarded Dalton with sole physical and legal custody of Owen.

NAME CHANGE

Jessica also argues that the district court erred in granting Dalton's request to change Owen's name from her last name to Dalton's last name. She asserts that Dalton failed to prove that such a change was in Owen's best interests.

The question of whether the name of a minor child should be changed is determined by what is in the best interests of the child. *State on behalf of Connor H. v. Blake G.*, 289 Neb. 246, 856 N.W.2d 295 (2014). The party seeking the change in surname has the burden of proving that the change in surname is in the child's best interests. *Id.* Cases considering this question have granted a change of name only when the substantial welfare of the child requires the name to be changed. *Id.* On appeal, a trial court's decision is reviewed de novo on the record. See *id.*

In Nebraska, there is no preference for either the paternal or maternal surname in name change cases; rather, the child's best interests is the sole consideration. *Id.* Courts review a list of nonexclusive factors to determine whether a change of surname is in the child's best interests. *Id.* These factors include (1) misconduct by one of the child's parents; (2) a parent's failure to support the child; (3) parental failure to maintain contact with the child; (4) the length of time that a surname has been used for or by the child; (5) whether the child's surname is different from the surname of the child's custodial parent; (6) a child's reasonable preference for one of the surnames; (7) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent; (8) the degree of community respect associated with the child's present surname and the proposed surname; (9) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and (10) the identification of the child as a part of a family unit. *Id.*

In the district court's order, it stated:

As to [Dalton]'s request for a change of Owen's surname to that of Wortman, it is the court's opinion since physical custody is being placed with [Dalton] and Owen will soon begin preschool, that it is in Owen's best interest to have the surname of "Wortman" to avoid difficulties or embarrassment in school the child may experience due to bearing a different last name from Wortman.

The district court did not elaborate any further on its decision to change Owen's name. In addition, it does not appear that the court considered any of the foregoing factors besides whether Owen would experience embarrassment about having a different last name than his custodial parent when he entered school.

Upon our de novo review of the record, we observe that there was very little specific evidence presented at trial as to changing Owen's name. Dalton testified that he wanted Owen to share his last name, while Jessica testified that she wanted Owen to keep her last name because he has had that name since his birth.

In analyzing the factors which are relevant to this case, we find that there are a few factors which weigh in favor of changing Owen's surname. There was evidence that Dalton was engaged to Andrea and that they planned to marry in the near future. As a result, if Owen's surname was changed, he would arguably be able to more easily identify with a family unit. Additionally, Dalton is now Owen's custodial parent. Dalton did not know he was Owen's father when Owen was born, so Dalton's last name was never even considered as an option at that time.

The remaining factors either are not relevant to our analysis or do not weigh in favor of the name change. It is clear that by the time of trial, both Dalton and Jessica were involved in caring for Owen. There was evidence presented at trial that Jessica had briefly left Owen with Angela shortly after his birth when she moved to another city. Jessica did return, however, and, as a result, there is no evidence of either parent failing to maintain contact with Owen in the long term. Additionally, while it is clear that Owen is financially supported in both parents' homes, Jessica admitted that she relies on Angela to assist her in financially providing for Owen. Jessica's limited financial resources can be attributed to her young age and to her attending school full time. We cannot say that Jessica is "failing" to provide for Owen financially. There was no evidence that either Dalton or Jessica had engaged in any sort of misconduct. At a little over a year old, Owen was too young to express a preference or to appreciate a change in his surname. Further, neither party presented any evidence to demonstrate that Owen would experience harassment or embarrassment as a result of bearing either of the parties' surnames. If Owen had a different name than his custodial parent, this may create some logistical difficulties, especially when he reaches school age, but there was no evidence presented to indicate any significant problems associated with either surname.

Keeping in mind that Dalton bore the burden of proving that changing Owen's surname was in his best interests, and considering that we are constrained by case law which has granted a change of name only when the substantial welfare of the child requires the name to be changed, we must conclude that the district court erred in changing Owen's surname from Carrender to Wortman. See, e.g., *State on behalf of Kaaden S. v. Jeffery T.*, 26 Neb. App. 421, 920 N.W.2d 39

(2018). The evidence presented at trial was clearly focused on the issue of custody. As a result, the ten best interests factors for consideration as to the name change issue were only addressed tangentially as they related to the custody issues. In this trial, Dalton simply failed to provide sufficient evidence to warrant such a name change at the present time. As such, we reverse the district court's decision to change Owen's surname to Wortman.

## CONCLUSION

Based upon the evidence presented at trial, we affirm the district court's decision to award sole physical and legal custody of Owen to Dalton. However, we reverse the court's decision to grant Dalton's request to change Owen's surname. Owen's surname will remain Carrender.

AFFIRMED IN PART, AND IN PART REVERSED.